MARY C. ALDRICH, HELEN B. KING, HENRY S. SWINTON, HELEN M. SEAL, and NORMAN BROWN by W. C. KING, his next friend v. PRISCILLA E. HASSINGER, ANNIE H. TURTON, HENRIETTA E. ROSS and DOUGLAS K. BROWN.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED OCTOBER 4, 1900.            DECIDED OCTOBER 29, 1900.

GALBRAITH AND PERRY, J.J., AND J. A. MAGOON, ESQ., OF THE BAR, IN PLACE OF FREAR, C.J., DISQUALIFIED.

M., being at the time grievously ill and about to die, and desiring to make a final disposition of her property either by will or by deed of trust so that said property should go to her five nephews and nieces, requested S., her most trusted friend and adviser, between whom and herself confidential relations existed, to assist her in effectuating that desire and intention. S., taking advantage of her great trust and confidence in him and fraudulently intending to obtain the absolute title to the property for himself, persuaded her to execute a deed, which he prepared and which did not express the trust desired, by leading her to believe that he would hold the property subject to that trust and that he would carry out her desire and intention concerning the same. Held, that S. in his lifetime held the property as a trustee *ex maleficio*, and that since his death his heirs have held and now hold the same as trustees, for the use of the five nephews and nieces and a conveyance ordered accordingly.

OPINION OF THE COURT BY PERRY, J.

(J. A. Magoon, Esq., dissenting).

These proceedings were instituted on the 10th day of November, 1891, before a Justice of the Supreme Court sitting, in Chambers, as a court of equity, by Mary C. Aldrich, Helen B.

King, Harriet N. Brown, Helen M. Seal, Henry S. Swinton, Charles E. S. Swinton, and Douglas K. Brown and Norman Brown, by William C. King, their next friend, complainants, against W. James Smith, respondent. The main prayer of the bill is that respondent be declared to hold certain property therein particularly described and situate in Honolulu, Oahu, as trustee for the use of certain of the complainants named. The case was tried and submitted during the month of December, 1891, and in January, 1893, the Justice before whom the trial was had resigned his office without having rendered a decision. W. Jas. Smith died on the 22d of March, 1896, and on the 15th of May of the following year a bill of revivor was filed, reciting the fact of the respondent's death and praying that Priscilla E. Hassinger, Henrietta E. Ross and Annie H. Turton, his heirs at law, be substituted in his stead as parties defendant and that the suit stand revived against them, in the same plight and condition as it was in before the death of the respondent.

In June, 1897, the cause, as revived, was submitted to a Judge of the Circuit Court of the First Circuit, who, in the month of October following, filed a decision and a decree in favor of the complainants. For certain defects in the matter of parties to the bill of revivor, that decree was reversed and the case remanded. Douglas K. Brown, too, having come of age and deeming his interests to be adverse to those of the other complainants, moved that his name be stricken from the record as that of a party plaintiff. His motion was granted, and he was subsequently made a party defendant. Other proceedings were had and finally the case, entitled as above, was again, in July of this year, argued before another Judge of the First Circuit, who also rendered a decision and signed a decree granting the relief prayed for in the original bill. The cause now comes to this court on appeal from that decree.

At this point, we wish to call attention to the fact that in the decree entered July 21, 1899, which purports to revive the original suit and to place it in the same plight and condition as it was in just prior to the death of W. Jas. Smith, the name of Charles E. S. Swinton as a party plaintiff is omitted and that of Helen

M. Seal is included as a party plaintiff. This was, apparently, by an oversight, or a clerical mistake. That decree itself recites that Charles E. S. Swinton was one of the original plaintiffs; and a stipulation, dated November 24, 1891, is on file, whereby all the parties concerned agree that "the name of Helen M. Seal may be stricken from the record as that of a complainant and that her name may be added as that of a party defendant, without necessity of amending the bill of complaint, that the bill shall be considered as though it had been so amended, that a copy of the bill may be handed to the attorney in fact of said Helen M. Seal, who will accept service thereof, and that the trial of the issues herein may thereupon proceed as though no change had been made in the parties hereto." The decree of October 24, 1899, makes the title of the suit as revived the same as does that of July 21, 1899, excepting only that the name of Douglas K. Brown is added as that of a defendant. If this was in fact due merely to an oversight or clerical mistake, the decrees should be corrected by the court below.

The allegations of the original bill are, in brief, as follows: That complainants are respectively related to the late Martha C. Swinton, thus: Henry S. Swinton and Charles E. S. Swinton as brothers, Helen M. Seal as sister, Mary C. Aldrich, Helen B. King and Harriet N. Brown as nieces, and Douglas K. Brown and Norman Brown as nephews, and that these complainants are the only heirs at law of said Martha C. Swinton; that Douglas K. Brown and Norman Brown are minors; that said Martha C. Swinton was possessed in her own right, during her life of a certain piece of land described; that Martha C. Swinton died on or about August 4, 1891; that for several months prior to her death, she suffered from a malady which finally resulted in her death and which, toward the close of her life, confined her to her room and bed; that for many years past it had been and, at the time of the execution of the deed hereinafter mentioned, was the intention, desire and purpose of said Martha C. Swinton to so leave and dispose of her said property that, at her death, its beneficial ownership, use and occupancy should be secured to her nephews and nieces above mentioned, in equal parts and rights

and to the exclusion of all other persons; that for many years prior to and at the time of her death, Martha C. Swinton and respondent Smith sustained friendly and confidential relations, the one to the other, and that during all of said period said respondent was the most trusted friend and adviser of said Martha in regard to her property and business transactions; that within a few weeks of her death, Martha, realizing that her end was near and desiring and intending to arrange her property affairs in the manner above stated, summoned said respondent into conference, to advise her as to the best method of so disposing of said property as to attain said object and that in the course of the conference which then followed, said defendant advised and persuaded said Martha C. Swinton that the only safe manner in which to carry out the intention and purpose of said Martha C. Swinton to so secure to her said nieces and nephews the said property, in manner as aforesaid, was to make a conveyance thereof to said defendant, in trust for, and to the use of said nieces and nephews of said deceased; that among other reasons adduced by defendant to persuade said deceased into adopting such course as aforesaid, was the expense of probate proceedings for the establishment of a last will and testament, and the uncertainty of being able to sustain a will of said deceased in favor of her said nieces and nephews, in case of a contest thereof by the brothers and sister of said deceased above named; that in consequence of said representations to said deceased, by and on the part of said defendant, and which said deceased then and there believed, she, said deceased, was then and there induced and persuaded to execute, acknowledge and deliver the deed in question; that the respondent, being the confidential adviser as aforesaid and well knowing the desire and purpose of said Martha, seeking a selfish and fraudulent advantage in respect of said property, deceived and persuaded Martha into the belief that said deed, so executed by her, would secure to her nieces and nephews the beneficial ownership of the said property, and promised and assured Martha that he would hold said property under said deed in trust for and to the use of said nephews and nieces; that since the death of Martha said respondent has denied the trust character of said conveyance and claim-

ed the sole legal and beneficial ownership in said property and denies that said nephews and nieces have any right, equitable or otherwise, therein; and that said deed was obtained by misrepresentation and fraud, and does not represent the wish, purpose or intent of the grantor.

The prayer is as already stated above, and, in the alternative, that respondent be ordered to convey the property to the nephews and nieces named. A general prayer of relief is also added.

Respondent in his answer admits the relationship of the parties, the minority of the two nephews, the ownership by Martha of the property mentioned, adding that it was conveyed to her by him in 1868 for no consideration other than the affection and friendship which he bore towards her; admits the facts stated in the bill concerning Martha's illness, except that he says that she was confined to her bed for only a few days; denies the truth of the averments concerning Martha's intention as to the disposal of her property; admits the existence of friendly and confidential relations between himself and Martha and the fact that he was her most trusted friend and adviser in regard to her property and business transactions; denies the truth of the allegations as to how he obtained the deed and states the facts on that subject to be these: that about three or four weeks before the death of said Martha C. Swinton, she sent for the defendant to come and talk with her about the disposition of her property in case she should not recover from the illness from which she was then suffering; that said Martha C. Swinton then and there told him that she did not want to show any partiality toward any of her relatives in the distribution of her property, and that she did not wish to leave it in such a manner that they could divide it up or dispose of it, as she desired that it might remain intact in order that they might all of them at all times have a place where they could live if they met with reverses or were unable to provide themselves with a home elsewhere. She also stated to the defendant that there were so many of them, she was afraid that unless there was some one person having control of the matter, they would get to squabbling among themselves and cause trouble; that the said Martha C. Swinton, without suggestion on the part of the de-

fendant, stated that she had thought of making a will, but was afraid of the uncertainty of establishing a will, and thought it had better be done by deed, thus placing the property in a way that by his deed or will it might eventually go to the relatives whom he knew that she preferred should eventually possess it, in which opinion the defendant concurred. That she then told the defendant that she wanted him to act for her as the person to whom the property should be conveyed, with discretion in him to allow all or any of her relatives to use the said premises as a homestead, the reason for the exercise of such discretion being that any relative making trouble for the others living thereon at the time being, could be removed therefrom in the interest of the family peace without the legal right to refuse so to remove, and with the further object of preventing any of her said relatives from selling or otherwise disposing of said premises or using it for any other purpose than as a homestead. That he agreed to her request and prepared the deed and submitted it to her, that Martha carefully examined the same and declared that it expressed exactly what she wanted; that she never expressed to respondent any desire that her nephews and nieces should exclusively have the beneficial interest in the land but on the contrary repeatedly stated to him that she desired all the persons within the degree named to be treated alike unless respondent in his discretion should see fit to pursue a different course. Respondent further denies, in his answer, that he sought any selfish or fraudulent advantage in respect of said property, or that he deceived or persuaded said deceased into the belief that said deed so executed by her would secure to her said nieces and nephews the beneficial ownership of the property therein described, or that he promised and assured said deceased that he would hold said property under said deed in trust for and to the use of said nephews and nieces of said deceased and their heirs; that on the contrary the said deed was executed by the said deceased with full knowledge by the said Martha C. Swinton of the meaning and intent of such deed as therein expressed, and with the intent and desire on her part to dispose of the said property in manner as the same is disposed of by the said deed; and that he has sought

and is now seeking solely to carry out the intent and desire of Martha as in his answer and in the deed expressed; and denies that he has at any time claimed beneficial ownership to himself personally in said property and does not now claim any such ownership except in the event of the death of all of Martha's relatives within the second degree of consanguinity.

The instrument in question is in form an absolute deed with habendum, "to the said W. James Smith his heirs and assigns to his and their use and behoof forever." Then follows this clause: "But it is my wish that the said premises may at all times be available for a homestead or place of dwelling for any or all of my blood relations of or within the second degree of consanguinity to me in the discretion of the said W. James Smith, or of him whom he shall appoint by deed or will for the purpose. The interpretation of the degrees of consanguinity to be that given by Blackstone."

The questions which now present themselves for determination are, first, whether or not the facts and circumstances attending the execution of the deed were such as to charge the property conveyed with a constructive trust, and, second, whether or not the language of the deed itself is such as to create a precatory trust.

The contention of counsel for the present respondents is that the evidence adduced fails to show that the deed was obtained by fraud or under other circumstances such as will justify the Court in declaring that a constructive trust exists, and that the language of the deed is wholly insufficient to create a precatory trust. For the complainants, the opposite view is urged on both subjects.

Undisputed evidence shows that Martha C. Swinton was, at the time of the execution of the deed on July 28, 1891, and for at least two or three weeks prior thereto had been grievously ill. About two weeks prior to the date named she, realizing that her end was near and desiring to make a final disposition of her property, which consisted solely of the piece of land now in controversy and a few articles of personalty, sent for W. J. Smith, who, as is admitted, was her most trusted friend and adviser and between whom and herself most confidential relations existed, to

assist her in carrying out her purpose. Smith called on Martha as requested and an interview followed between the two. Between the time of that first interview and the date of the execution of the deed, Smith called on Martha several times and on each of these occasions, as, likewise, at the first interview, no one else was present.

We are satisfied from the evidence that at that time it was Martha's intention and desire to make a last and final disposition of her property, testamentary in its character. Whether she then had in mind a will or a deed is not, perhaps, entirely clear, but the circumstances of the case and the respondent's own evidence furnish strong ground for believing that a will was what she first desired. She had often for a long time past and even during the period of her last illness talked of leaving her property at her death to certain persons (the question of beneficiaries will be hereafter referred to) and the usual and ordinary method of such a disposition is by will. Moreover, the evidence shows that Smith advised her against making a will because of the cost of proceedings in probate and because of the possibility of a contest by relatives not provided for in the will. There would have been no necessity for this advice if she had not suggested a will. The subject was certainly discussed to some extent. See evidence of Smith, p. 86: "Q. She spoke of the uncertainty of establishing a will? A. Yes, while the question of litigation sometimes arises there was some of her relatives who might have been living that would bring a suit in sometimes. Q. So that that question was canvassed in her mind? A. She must have been thinking it over herself, she only mentioned the will the first time and then she dropped the idea. Q. She adopted the deed then as a surer method of giving the property to those whom she preferred? A. That is the way I understood it, yes, that is what she meant."

The thought of a will, then, having been abandoned and, as we believe, by reason of the advice given by Smith, Martha, to use Smith's own words, adopted the deed as the surer method of giving the property to those whom she preferred. But had she in mind an absolute deed granting the whole beneficial as well as the legal ownership to Smith, or did she desire simply to con-

10

stitute him a trustee to hold the property for the benefit of others? We believe from the evidence that the latter was the fact. The testimony adduced for the complainants shows clearly that Martha had often expressed her intention of leaving at her death the property in question to her two nephews and three nieces, and we are satisfied that it was in fact her intention to so leave it. Even after the conversation had by her with Smith at which the subject of disposal of the property was discussed, she said to Hattie Brown, one of the nieces and a credible witness, that "she wished Mr. Smith would hurry up with the deed, he kept putting it off and she was afraid it would be too late and then she went on to explain what it was for, the deed she was leaving to Mr. Smith in trust for us children," (by the "children" Martha meant, the evidence shows, her five nieces and nephews); and to Mrs. Harry Swinton, in presence of Mrs. Aldrich, she said that "she thought the place would be left all right as Mr. Smith was going to make out a deed of trust and leave it to the five children."

Smith, it is true, while on the witness stand, at times denied *in toto* that he held the legal title in any trust capacity and claimed that the deed was intended as an absolute conveyance to him, but the truth of these assertions is amply disproven by his formal answer on file herein, his other testimony in the case and by other evidence. In paragraph 7 of the answer he says, "that the said Martha C. Swinton, without suggestion on the part of the defendant, stated that she had thought of making a will, but was afraid of the uncertainty of establishing a will, and thought it had better be done by deed, *thus placing the property in a way that by his deed or will it might eventually go to the relatives whom he knew that she preferred should eventually possess it,* in which opinion the defendant concurred." "Well, if you must have it, I will state that it was her wish eventually that the boys named in the bill of complaint and her niece, Hattie Brown, should have the residence and that property, leaving it at my discretion to consider whether or not their conduct should deserve such a disposition of the property eventually. * * * She

put it as I have put it there as near as possible. She wished it to be available for any of those there all or any at any time." Q. "Who were in that degree?" A. "Yes." Q. "And eventually it should go to those three whom you mentioned?" A. "Yes, that is a point I did not wish to speak about for fear of hurting some of their feelings."—Evidence of Smith. From the same source: "Did you understand that that was to be conveyed to you for your own property or for you to hold as you have stated for the benefit of her relatives?" "That was her idea." * * * "In other words, she would not have made the deed in the way that she did if she had supposed that you would have devoted it to other purposes than those she wished and although she conferred upon you an absolute discretion, it was in the confidence that you would use that discretion in favor of her relatives?" A. "Of course, if she had not complete confidence in me she could not have given me complete discretion." Q. "And you encouraged her in thinking that you would so use your discretion for the benefit of her relatives?" A. "Well, I would not so encourage her when I had very little to say about the matter, it was done in a very short time." Q. "You allowed her to think that; you did nothing to dissuade her from that idea, *not for your own benefit, for the benefit of those whom she said?*" A. "*Well, I think that was the idea.*" Q. "So that at the time of making this deed to you, she did not believe and you did not give her to believe that you were seeking your own profit or that you would take advantage of the absolute character of the deed, in order to use the property for your own use?" A. "*I don't think that she thought or dreamt it.*"

The clause quoted above as being tacked on to the habendum, whether or not it is sufficient in itself to constitute a precatory trust, is certainly strong corroborative evidence that it was the desire and intention of Martha that the grantee should hold the property subject to a trust of some sort.

Upon this and all the other evidence in the case, then, we believe and find that it was the desire and intention of Martha at the time she asked Smith's assistance in the drawing up of the necessary instrument, that the whole beneficial ownership in the

property should pass to her five nephews and nieces and that the instrument to be drawn up should be but the means of accomplishing that object. Smith's statement that Martha wished to make the two nephews and Hattie Brown the sole beneficiaries to the exclusion of the two other nieces, we think was correctly accounted for by Circuit Judge Carter on the theory that it was inspired by hostility towards the two nieces because of the active part taken by them in bringing these proceedings.

The fact that Martha on one or more occasions said that she would leave the property to the children "as a homestead," does not necessarily show that she intended for them a life estate only. If that had been her intention she would have made some provision as to how the remainder was to be disposed of. No mention of any such remainder, or provision concerning the same was ever made by her. Moreover, where she did contemplate provision for life only, she said so distinctly, as in the case of Capt. J. H. Brown. We believe on all the evidence that she did not intend to limit the estate of the five for life.

Returning now to the subject of the drawing of the deed, we find that Smith delayed about a week after his conversation with Martha above referred to and finally on the 28th of July, 1891, produced the instrument. Martha, after reading it over, said: "What made you do it that way?" to which Smith replied, "That's the best way to do it, so that there shall be no quarreling," or words to that effect. Martha then signed the deed, and about ten or fifteen minutes later acknowledged it before a notary. We believe from the evidence that the deed was executed in the belief, on Martha's part, that in that way would her will concerning the property as above stated be accomplished and in the full confidence that Smith would faithfully carry out her wishes; further, that Smith led her to believe that if she signed the deed as drawn he would see to it that the property did go in accordance with her wishes, to her five nephews and nieces, that but for his interference and advice she would have disposed of her property either by will or by deed unmistakably defining the trust desired, and that Smith, in advising her as he did and in obtaining

the deed as it now stands, acted *mala fide* and with the fraudulent intention to secure to himself the absolute title to the land.

It would be against conscience to permit Smith or his heirs to retain the advantage thus gained. Under circumstances such as these, equity regards the grantee as a trustee *ex maleficio.* The constructive trust so declared is not based upon the promise itself, but arises out of the intentional fraud committed. The bill sufficiently alleges facts upon which this relief can be granted in this case.

"In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property either in the hands of the original wrongdoer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust. The forms and varieties of these trusts, which are termed *ex maleficio* or *ex delicto*, are practically without limit. The principle is applied wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrongdoer."—2 Pom. Eq. Juris., Sec. 1053.

"A second well-settled and even common form of trusts *ex maleficio* occurs whenever a person acquires the legal title to land or other property by means of an intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose—as, for example, a promise to convey the land to a designated individual, or to reconvey it to the grantor, and the like— and having thus fraudulently obtained the title, he retains, uses, and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained, is in fact a scheme of actual deceit. Equity regards such a person as holding the property charged with a constructive trust, and will compel him to fulfill the trust by conveying according to his engagement."—Sec. 1055, Ib.

See also Browne on the Stat. of Frauds, Sec. 94 et seq.; 1 Story Eq. Juris. Sec. 256; Hill on Trustees, top page 234.

"It will be observed that in all these cases there is something more than the mere receipt of the title to real estate, with a parol promise to hold it, subject to a trust. There is an interference with the owner of the property, by means of which he is induced to forego the execution by himself of his designs for the benefit of a third person, and to leave the execution to the party deluding him by a false promise, and through such false promise obtaining title to the property. * * * The distinction is this: If A voluntarily conveys land to B, the latter having taken no measures to procure the conveyance, but accepting it, and verbally promising to hold the property in trust for C, the case falls within the statute, and chancery will not enforce the parol promise. But if A was intending to convey the land directly to C, and B interposed and advised A not to convey directly to C, but to convey to him, promising, if A would do so, he, B, would hold the land in trust for C, chancery will lend its aid to enforce the trust, upon the ground that B obtained the title by fraud and imposition upon A. The distinction may seem nice, but it is well established. In the one case B has had no agency in procuring the conveyance to himself. In the other he has had an active and fraudulent agency. In the one case he has done nothing to prevent a conveyance to the intended beneficiary. In the other he has, by false promises, diverted to himself a conveyance about to be made to another."—*Lantry v. Lantry*, 51 Ill. 464-466.

See also *Larmon v. Knight*, 140 Ill. 232; *Dowd v. Tucker*, 41 Conn. 197, 198, 205; *Fischbeck v. Gross*, 112 Ill. 208, 214; *Hooker v. Axford*, 33 Mich. 452, 456; *Barrow v. Greenough*, 3 Vesey Jr. 151, 154; and *Giffen v. Taylor*, 139 Ind. 373.

Some of the cases seem to go to the extent of holding that even where the promise to hold for the benefit of another, or to convey to another, is made in good faith, if the grantee thereafter declines to carry out his agreement, equity will grant relief by declaring the grantee a trustee; but we need not now pass upon that question.

Hattie Brown, one of the nieces, died after the trial and prior to the filing of the bill of revivor. The record fails to show who her heirs are.

In view of the conclusion we have reached on the subject of

the constructive trust, it becomes unnecessary for us to consider the question of a precatory trust.

In our opinion, Priscilla E. Hassinger, Annie H. Turton and Henrietta E. Ross, the heirs of W. James Smith, deceased, should be declared trustees of the property described in the deed under consideration for the use of Mary C. Aldrich, Helen B. King, Norman Brown and Douglas K. Brown, and other, if any, the heirs of Harriet N. Brown, and should be ordered to convey the said property by a good and sufficient deed to said beneficiaries.

The case is remanded to the Circuit Judge of the First Circuit, with instructions to correct, in the particulars above specified, the decrees reviving the original cause, if it be found that such decrees were in fact erroneous in those respects, to ascertain who the heirs of Harriet N. Brown are, and to enter a decree in accordance with the foregoing views.

*Kinney, Ballou & McClanahan* and *H. A. Bigelow* for complainants.

*Robertson & Wilder* for Henrietta E. Ross.

*W. O. Smith* and *A. Lewis, Jr.,* for Priscilla E. Hassinger and Annie H. Turton.

No appearance of or for D. K. Brown.

DISSENTING OPINION OF J. ALFRED MAGOON, ESQ.

I am unable to concur in the opinion of the Court. Were I not satisfied that the defendants should prevail in this case a difficulty presents itself which cannot be overcome on this appeal as the case now stands.

The original plaintiffs were Mary C. Aldrich, Helen B. King, Harriet N. Brown, Henry S. Swinton, Charles E. S. Swinton, Helen M. Seal and Norman Brown, and Douglas K. Brown, by their next friend W. C. King.

Henry S. Swinton has practically disclaimed in his testimony, and it is perhaps immaterial as to him whether he is party plaintiff or defendant. Helen M. Seal, by stipulation, was made party defendant, but an order of the Court signed October 24th, 1899, contains the following,—"said suit shall hereafter be entitled

Mary C. Aldrich, Helen B. King, Henry S. Swinton, Helen M. Seal and Norman Brown by W. C. King, his next friend, vs. Priscilla E. Hassinger, Annie M. Turton and Henrietta E. Ross and Douglas K. Brown." It will be observed that Mrs. Seal is still improperly joined as party plaintiff and that Charles E. S. Swinton and Hattie K. Brown by the same order are left out of the case entirely with nothing on the record to show the reason therefor. The interests of Charles E. S. Swinton are directly opposed to those of Mary C. Aldrich, Helen B. King, Norman Brown and Harriet N. Brown, and he should not be a party plaintiff in this action as he has not now and never has had independent counsel herein, and has not personally made any appearance in the case. While it is not necessary that a party plaintiff having interests adverse to the other plaintiffs should in equity be a defendant, (1 Pom. Eq. Jur. p. 98) it is essential that the record show that he is represented, if he be made a party plaintiff, but no attorney can represent conflicting interests in a case.

"An attorney cannot accept employment from adverse litigants at the same time and in the same controversy, though his intentions and motives are honest. The rule is a rigid one and designed, not alone to prevent the dishonest practitioner from fraudulent conduct, but as well, to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests rather than to enforce to their full extent the rights and interests which he should alone represent."

*Strong v. International Building Loan & Investment Union,* 82 Ill. App. 426 and see Weeks on Attorneys p. 548, 15 Ency. Pld. & Pr. p. 584. It is a familiar rule of equity that all persons materially interested in the event of the suit, must be made parties. This confusion with reference to the parties and their appearance is, in all probability, due to the fact that this litigation has been before the Courts, in one way or another, since 1891, and many different counsel have appeared in the case. As I desire that no misunderstanding shall arise with reference to what I have above stated, I will say that no reflection of any kind is directed against counsel in the case, either for the real plaintiffs

or the defendants, for nothing could be more honorable than their conduct in their most able presentation of this case.

Counsel for Mrs. Aldrich, Mrs. King, Harriet N. Brown and Norman Brown, who should be the real plaintiffs in this case as it now stands, rely for relief upon two grounds. They, in the first place, contend that a precatory trust was created. While the doctrine of precatory trust is firmly established it is certainly looked upon with great disfavor. 2 Pom. Eq. Jur. Sec. 1017. The doctrine depends upon a presumption of law that a person using words of belief, desire, will, request, wish, hope, etc., intended to give to those expressions the meaning of direction, command, etc. The doctrine is applicable to wills which are made in contemplation of death and not to deeds. In a will the testator must leave to others the execution of his wishes. He is obliged to substitute as it were the discretion of another for his own. If it is claimed that the deed in question was to serve the purpose of a will, the answer is that it was not a will, and I do not believe in extending the doctrine of precatory trust. Even though the deed created a precatory trust it would contravene the contention of the real plaintiffs. By the deed the relatives within the second degree of consanguinity would be the *cestuis que trustant*, but counsel for the real plaintiffs rely upon parol proof to establish the trust in their behalf in common with Douglas K. Brown. This is directly contrary to every principle of law and equity. It is an attempt to vary a written instrument by parol proof, which manifestly cannot be done. 1 Perry on Trusts, 3rd p. 113, in note and case there cited; *Irvine v. Sullivan*, Law Rep. 8 Eq. 673.

"When parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagements, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking was reduced to writing, and all oral testimony of a previous colloquim between the parties, or of conversation of declarations at the time when it was completed or afterwards, as it would tend in many instances to substitute a new and different contract from the one

which was really agreed upon, to the prejudice, possibly of one of the parties, is rejected." 1 Greenleaf Evi., 13th Ed., p. 321.

"The writing, it is true, may be read by the light of surrounding circumstances in order more perfectly to understand the intent and meaning of the parties, but as they have constituted the writing to be the only outward and visible expression of their meaning, *no other words* are to be added to it, or substituted in its stead. The duty of the court in such cases is to ascertain, not what the parties may have secretly intended, as contradistinguished from what their words express, but what is the meaning of the words they have used." Id. 322.

*   *   *   "The rule excludes only parol evidence of the language of the parties, contradicting, varying or adding to that which is contained in the written instrument, and this because they have themselves committed to writing all which they deemed necessary to give full expression to their meaning, and because of the mischiefs which would result if verbal testimony in such cases were received." Id. p. 328.

The degrees of consanguinity should be computed according to the common law; but if it was intended to create a trust and it is uncertain under which rule the degrees are to be computed, and for this reason the deed to Smith is inoperative, the land must go to all of the heirs of Martha Swinton and not to the real plaintiffs.

The real plaintiffs in the second place, contend that in case no precatory trust was created, the facts and circumstances show a constructive trust. A constructive trust must under the circumstances in this case be established by actual fraud; there is no element of constructive fraud involved. If such a trust exists, it rests entirely upon a deliberate intent to cheat and defraud Martha Swinton when the deed was signed. To sustain this contention the evidence should be clear and convincing. 15 Am. & Eng. Ency. of Law, 1195; *Lantry v. Lantry*, 51 Ill. 458.

Instead of being convinced that there is actual fraud, I am convinced to the contrary. Counsel for the real plaintiffs state the case as strongly in their favor as it can be put. This is what they say,—"Now those whom she preferred, it is perfectly clear from the evidence in the case, were the five children already mentioned, so that it seems pretty clear that at the time W. James

Smith called with reference to the property Miss Swinton's idea was still as it had been for years past, that the property after her death should go to her five nephews and nieces." I cannot consent to brand a man as a scoundrel upon any such theory. That it is *"pretty clear,"* according to the mind of counsel for the real plaintiffs, that Miss Swinton's idea was that the property after her death should go to her five nephews and nieces, is not sufficient. It must be *clear.* Many things might have happened between the time when she last spoke to any of her nieces and nephews in regard to the matter, and the execution of the deed, which was about one week, according to the view of the testimony most favorable to the real plaintiffs. Even if it were admitted that the testimony for the real plaintiffs in this regard be true, it would not necessarily follow that Miss Swinton had not changed her mind. She might have recognized her ingratitude towards Mr. Smith, as she saw her end approaching, and have been stricken with remorse at being the recipient of his bounty for all those twenty-three years, without recognizing him in any way at her death. She had no one who had any peculiar claims upon her but Mr. Smith. She was greatly indebted to him, and is it any wonder that she should want to return to him, when she thought she no longer had any use for it, the property which he had so generously given her. She could see that by giving it to her five nephews and nieces in all probability it would go from him forever, and why should they have it? What had they done for her to counterbalance the services and generosity of Mr. Smith, not only towards her but towards the members of her family. Under the circumstances was he not the natural object of her bounty? She had every reason to believe that, owing to the almost paternal love he had shown for her nephews and nieces, he would give the property to them or to such of them as he thought most deserving when he should no longer need it I cannot bring myself to believe that this man who had been so good to the members of this family, had any intention in his heart to commit the fraud now attempted to be fastened upon him. It was Miss Swinton who urged the making of the deed—who represented the necessity for haste. The deed was executed in the light of day,

with the full knowledge of the family. There was no attempt at concealment. Miss Swinton was in full possession of her mental faculties. It must be assumed that she was a woman of intelligence. She spoke English better than her native tongue. She took the deed and read it carefully over in the presence of at least one witness, and then, according to the statement of that witness whose testimony is relied upon by the real plaintiffs, she asked Smith, "What made you do it in this way? A. That is the only way I can stop a row, from being a row. Q. She did not say anything? A. That is all I heard. * * * Q. Did not Miss Swinton say to Mr. Smith, I want this to go to the five children, or anything about the children? A. No, sir. Q. Were there no words about the children whatever? A. No, sir." He kept the matter of the deed no secret. He spoke of it to Mr. Aldrich before and after it was signed. After the deed was signed he went for a notary, and it was duly acknowledged before him, as her free act and deed. It was signed July 28, 1891, and filed for record the next day, thus becoming public to the world.

The conduct of the real plaintiffs does not sustain their statements that there was to be a trust deed. They claim that it was perfectly understood, that there was to be a trust deed executed, in which they were to be the beneficiaries, yet not one of them makes any suggestion as to what it should contain. After it is executed not one of them ever inquires about it of Miss Swinton, nor makes any inquiries as to its terms. Miss Swinton herself only makes one allusion to it, according to the statement of Hattie N. Brown, who testifies that Miss Swinton said "I don't like those papers, I don't like them, but she supposed he knows best, that it will be all right, she hopes so." I cannot understand how persons who claimed almost a vested right to property should be as remiss as the plaintiffs have been in this case. After the lips of Martha Swinton were sealed so that she could not vindicate her life-long friend and benefactor from the calumny to which he is now subjected, vigorous inquiry and search begins to be made, and immediate steps were taken to establish what the real plaintiffs claim to be their rights. Why this sudden activity after,

why the apathy immediately prior to Miss Swinton's death? The very language of Miss Swinton after the deed was signed as related by Hattie N. Brown if her testimony is true, should have produced immediate action. To me, the reputation of the living should not be blasted, nor the memory of the dead consigned to obloquy upon such a showing.

None of the witnesses for the plaintiffs, with the exception of Mahuna, testify to anything that took place at the time of the execution of the deed, and the alleged fraud of Smith depends entirely upon assumption. All of the witnesses for the real plaintiffs are interested, with the exception of the plaintiff Henry S. Swinton, who, in his testimony disclaims all interest, and Mahuna. Mr. Swinton's testimony is indefinite and unsatisfactory. There is nothing in the case which does not entitle Mr. Smith's testimony to as much weight as any or all of the witnesses for the real plaintiffs, and he positively and categorically denies that any misrepresentations were made by him to Miss Swinton with the circumstances strongly in his favor. A few disconnected statements of his, partly words of the lawyer addressing questions to him, with reference to what was taking place in Miss Swinton's mind as to her intentions, are apparently of great weight with the court in the establishment of a trust. The following is one of such questions, "So that at the time of making this deed to you she didn't believe, and you didn't give her to believe that you were seeking your own profit, or that you would take advantage of the absolute character of the deed in order to use the property for your own use? A. I don't think she thought or dreamt it." This question and answer must have been allowed through inadvertence. Mr. Smith could not possibly have known what was taking place in Miss Swinton's mind, excepting as indicated by her conduct and words. His answer is not evidence. The question is misleading for the reason that it embraces several propositions which do not admit of one answer. The testimony elicited under such circumstances is to my mind, entitled to no consideration.

Mr. Smith's testimony, taken as a whole, shows conclusively that the property was to be given to him and when he was

through with the same, it was Miss Swinton's wish that it should go to her relatives. This, undoubtedly, was the wish of Mr. Smith also, at that time.

I fail utterly to understand how a constructive trust can be grafted upon a deed in the very teeth of the express words of the deed itself. If there is to be a trust the court might possibly supply that which is omitted from the deed, but it ought not directly violate its provisions. The trust, if any trust exists, is not limited to the five nephews and nieces, but extends to all those within the second degree of consanguinity. It would be difficult to find a clearer case of varying a written instrument by parol testimony.

The question of undue influence does not arise in this case. There is no claim that Smith persuaded Miss Swinton to give the land to him, though she had intended to give it to her nieces and nephews, that is, that he over-persuaded her to abandon her intention to give it to them, and induced her to give it to him; but the contention is that the deed was one that would carry out her wishes when he knew that it did not express her wish at all.

The real plaintiffs now ask the court to declare a trust in their favor but there is no contention that the trust as established by the opinion of the court is anything like what Miss Swinton desired. There is no provision here as to the Browns; there is no provision with reference to the different members of the family having a homestead on the premises; there is no provision for Miss Swinton herself in case she had survived; there is no trustee to control the premises and protect the plaintiffs against each other, which was certainly Miss Swinton's desire, else what would be the object of a trust deed? It is not to be presumed that Miss Swinton desired to have a trust deed just for the purpose of appointing a trustee merely with no powers; and she makes no objection when Smith replies to her "that is the only way I can stop a row." The court in this instance declares a trust which to my mind violates the intention of Miss Swinton beyond any doubt. Even Mrs. Helen B. King says of this important trust deed, "she (Miss Swinton) didn't name the proposed trustee * * * she didn't mention the terms or any of the terms

of the proposed trust." Mrs. Aldrich nullifies to a large extent all of her testimony with reference to the trust deed when she says "She told me to step in at Mr. Smith's on my way home and tell him to hurry up with the paper" and then as though she had forgotten what she was to say, she adds, "with the deed of trust." In another part of her testimony she states "I told Mr. Smith to hurry up with the papers. * * * Q. Are you sure that you used that term to Mr. Smith when you went to see him first, that your aunt wanted him to hurry up with the deed of trust? A. Yes I said a deed of trust or as she calls it or some-thing like that, I used the words anyway. The Court: What did you say to Mr. Smith? A. I said my aunt wants you to hurry up with the deed of trust or something like that." Such indef-inite testimony tends to throw discredit upon the contention that there was to be a deed of trust rather than to support such con-tention.

A question has arisen in this case with reference to the parents of Douglas K. Brown one of the present defendants. He claims to be the son of Martha Swinton. This issue, it seems to me, should be tried and disposed of before any decision can be given upon the merits of this case. If his contention is true it dis-credits entirely the testimony of the real plaintiffs in the case. If the deed contained language sufficient to create a precatory trust, and such a trust could be created by a deed, all the relatives within the second degree and not the real plaintiffs are entitled to the benefit of a decree setting aside the deed, but I have in this opinion given my reasons why I do not consider a precatory trust was created.

I therefore respectfully dissent from the opinion of the Court.